# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 2, 2004

## STATE OF TENNESSEE v. JESSICA TROTTER-LAWSON and ANDREW SHERIFF

### Appeal from the Criminal Court for Shelby County
### No. 03-02844   Arthur T. Bennett, Judge

---

### No. W2004-00656-CCA-R3-CD  - Filed February 10, 2005

---

The appellants, Jessica Trotter-Lawson and Andrew Sheriff, pled guilty to theft of property over sixty thousand dollars.  As a result of the plea agreement, each appellant received an eight-year sentence.  Both appellants applied to the trial court for alternative sentencing.  After an evidentiary hearing, the trial court denied alternative sentencing and ordered the appellants to serve the entire sentence in incarceration.  Both appellants filed timely notices of appeal, challenging the trial court's denial of alternative sentencing.  After a review, we determine that a sentence of split confinement would best serve the interests of the public and the appellants.  Accordingly, the judgments of the trial court are reversed and remanded for entry of sentences of split confinement reflecting a period of twelve months of incarceration in the Shelby County Correctional Facility with the remainder of the eight-year sentence to be served on supervised probation.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Reversed and Remanded.

JERRY L. SMITH, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. C. MCLIN, JJ., joined.

Brent B. Stein, Memphis, Tennessee for the appellant, Jessica Trotter-Lawson, and Garland Erguden, Assistant Public Defender, Memphis, Tennessee, for the appellant, Andrew Sheriff.

Paul G. Summers, Attorney General & Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General, and Chris Scruggs, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual Background

Jessica Trotter-Lawson and Andrew Sheriff met in Bristol, Virginia, while working at a restaurant together. Mr. Sheriff left the restaurant in 2000 to take a job with UPS in Memphis. Ms. Trotter[1] and her son followed Mr. Sheriff to Memphis.

In August of 2000, Ms. Trotter was hired, through a temporary agency, by Linda and Doron Rozen, the owners of Town & Country Jewelry Store,. Ms. Trotter was initially hired to work as an office manager but within a few months was handling the Rozens' personal and business finances.

Around that same time, Mr. Sheriff moved in with Ms. Trotter and her son.[2] In December of 2000, Ms. Trotter began writing checks to herself and Mr. Sheriff from the company checking account. She forged the signature of either Doron or Linda Rozen and deposited the checks into a bank account.

At first, Ms. Trotter used her ex-husband's checking account to deposit the checks. However, in early 2001, Mr. Sheriff opened a bank account and began depositing the checks himself. Ms. Trotter also sent forged checks to credit card companies, a mortgage company, and hospitals. During this time period, Mr. Sheriff purchased a home and used the money provided by Ms. Trotter to purchase cocaine for his personal use. Mr. Sheriff was aware of the origin of the money. Ms. Trotter went on vacations, bought jewelry, visited day spas and bought lavish presents for friends and family with the money.

In late 2002, the Rozens discovered that Ms. Trotter had been forging checks and taking money from the company. In the two-year period from 2000-2002, Ms. Trotter forged checks and made unauthorized purchases totaling nearly half a million dollars. The Rozens filed a civil action and obtained judgments against both Mr. Sheriff and Ms. Trotter in the amount of $493,685.

On April 29, 2003, Mr. Sheriff and Ms. Trotter were indicted by the Shelby County Grand Jury on charges of theft of property over $60,000. As a result, both Mr. Sheriff and Ms. Trotter pled

---

[1] At the time that Jessica Trotter-Lawson met Mr. Sheriff, she was married. However, when Ms. Trotter moved to Memphis, she was in the process of a divorce and resumed using her maiden name, Trotter. For consistency, we will refer to her as Ms. Trotter.

[2] According to the record, Ms. Trotter had joint custody of her son.

guilty to felony theft and received an agreed sentence of eight years. Following their plea, both Ms. Trotter and Mr. Sheriff applied to the trial court for alternative sentencing. The trial court held an evidentiary hearing on February 5, 2004.

At the hearing, Ms. Trotter testified that she was twenty-five years of age and had a four-year-old son. She explained that she had joint custody of her son with her ex-husband. Ms. Trotter stated that she had a high school education and had attended at least four years of college at Emory and Henry. She was re-enrolled in college at the time of the hearing and attempting to complete her degree in philosophy and economics with a minor in math.

According to Ms. Trotter, she and Mr. Sheriff talked about stealing money from the Rozens prior to the first incident by "casually saying . . . [she] had never seen any kind of such a disarray that . . . [she] saw in the office." She went on to testify that "he [Mr. Sheriff] had asked me if it would be possible to pay off his credit cards. And then he asked me if he thought that maybe I could get five thousand dollars that he could use to buy drugs and then sell them." Evidently, the subject did not come up again until after Ms. Trotter started writing checks out of company funds to herself and Mr. Sheriff.

She testified that, at first, she told Mr. Sheriff that the money was a loan from the Rozens. After hearing her explanation for the origin of the money, Mr. Sheriff accused her of having an affair with Mr. Rozen. Ms. Trotter claimed that, at first, she lied to Mr. Sheriff to protect him. However, Ms. Trotter testified that she told Mr. Sheriff the truth about the source of the money within a few days of writing the first check. Ms. Trotter claimed that her motive was "love," that she was "afraid" because Mr. Sheriff threatened to tell on her if she quit writing checks and that she would do "whatever it took to stay together."

Ms. Trotter explained that she knew her actions were wrong and that her forgery became a habit over the two-year period of time. She testified that, at times, she wished that she would get caught. Ms. Trotter even claimed that she attempted to commit suicide two times by taking sleeping pills, but that she did not go to the hospital on either occasion. She admitted that she tried cocaine several times with Mr. Sheriff, but denied having a drug problem. She claims that prior to Thanksgiving of 2002, she left an envelope on her desk with information about her crimes, hoping that the Rozens would discover it while she was out of town.

Prior to her guilty plea, Ms. Trotter moved back in with her parents and re-enrolled in college. At the time of the hearing she was working, taking care of her son and attending school with a grade point average of 3.95. She acknowledged that what she did was "wrong."

David Trotter, Ms. Trotter's father, testified that Ms. Trotter was the oldest of his three children. He explained that Ms. Trotter moved back home in 2002 and, at the time of the hearing, was a full-time student, worked as a waitress and was a good mother to her son.

Andrew Sheriff explained to the court that he had a high school diploma, served four years in the Marine Corps and attended two years of college. After leaving the Marines, he was a member of the Army National Guard.[3] Mr. Sheriff testified that he moved to Memphis to accept a job with UPS and that he and Ms. Trotter moved in together shortly after she began working for the Rozens. He testified that he was suspicious that the money was stolen, but that he did not find out that the money was stolen until spring of 2001. Mr. Sheriff thought Ms. Trotter was getting the money from stocks and bonds she received in her divorce or that she was having an affair with Mr. Rozen. Mr. Sheriff admitted that he had abused cocaine starting in October of 2000 and estimated that he spent close to $100,000 supporting his habit. Mr. Sheriff claimed that he did not want the money, but that he used it even though he knew from where it was coming. Mr. Sheriff told the court that he tried to quit using cocaine several times, that he is now sober and that he would do anything necessary to rehabilitate himself.

The trial court heard testimony from several other people, including Mr. Sheriff's mother and current employer, who, despite his indiscretions, testified to his good character.

Linda and Doron Rozen testified that they discovered the embezzlement in November of 2002 while searching for an American Express credit card statement. Mrs. Rozen found evidence of the crime during her search and an audit revealed the full extent of the loss. The Rozens testified that they suffered tremendous losses to their credit rating and business reputation and have struggled to rebuild a business they spent twenty years building.

At the conclusion of the hearing on alternative sentencing, the trial court denied the requests for alternative sentencing. Both Mr. Sheriff and Ms. Trotter filed timely notices of appeal. On appeal, they challenge the trial court's denial of alternative sentencing.

Analysis

On appeal, the appellants challenge the trial court's denial of alternative sentencing. Specifically, Ms. Trotter and Mr. Sheriff argue that their offense was not "especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree" and that "the nature of the offense . . . [did not] outweigh all factors favoring a sentence other than confinement" as required by State v. Grissom, 956 S.W.2d 514 (Tenn. 1997), and State v. Millsups, 920 S.W.2d 267 (Tenn. 1995). The State counters that "the decision of the trial court was proper and in keeping with the principles of the Criminal Reform Sentencing Act."

"When reviewing sentencing issues . . ., the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action

_____

[3]Mr. Sheriff admitted on cross-examination that he received a reduced rank in the National Guard for being AWOL during the time that he was abusing drugs in Memphis.

-4-

is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the pre-sentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements. Tenn. Code Ann. §§ 40-35-103(5), -210(b); Ashby, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." Ashby, 823 S.W.2d at 169.

In regards to alternative sentencing Tennessee Code Annotated section 40-35-102(5) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration.

A defendant who does not fall within this class of offenders "and who is an especially mitigated offender or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). Furthermore, unless sufficient evidence rebuts the presumption, "[t]he trial court must presume that a defendant sentenced to eight years or less is an offender for whom incarceration would result in successful rehabilitation . . . ." State v. Byrd, 861 S.W.2d 377, 379-80 (Tenn. Crim. App. 1993); see also Tenn. Code Ann. § 40-35-303(a). The appellants herein pled guilty to theft of property over $60,000, a Class B felony. Thus, the appellants were not presumed to be favorable candidates for alternative sentencing. See Tenn. Code Ann. § 40-35-102(6). However, as Range I, Standard Offenders convicted of and sentenced to less than eight (8) years for the offense, the appellants were eligible for probation. See Tenn. Code Ann. §§ 40-35-102(6) & -303(a); Byrd, 861 S.W.2d at 379-80. However, all offenders who meet the criteria are not entitled to relief; instead, sentencing issues must be determined by the facts and circumstances of each case. See State v. Taylor, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987) (citing State v. Moss, 727 S.W.2d 229, 235 (Tenn. 1986)). Even if a defendant is presumed to be a favorable candidate for alternative sentencing under Tennessee Code Annotated section 40-35-102(6), the statutory presumption of an alternative sentence may be overcome if :

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Tenn. Code Ann. § 40-35-103(1)(A)-(C). In choosing among possible sentencing alternatives, the trial court should also consider Tennessee Code Annotated section 40-35-103(5), which states, in pertinent part, "[t]he potential or lack of potential for the rehabilitation or treatment of a defendant should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(5); State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994). The trial court may consider a defendant's untruthfulness and lack of candor as they relate to the potential for rehabilitation. See State v. Nunley, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999); see also State v. Bunch, 646 S.W.2d 158, 160-61 (Tenn. 1983); State v. Zeolia, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996); State v. Williamson, 919 S.W.2d 69, 84 (Tenn. Crim. App. 1995); Dowdy, 894 S.W.2d at 305-06.

In the case herein, the trial court learned that the appellants stole nearly half a million dollars over a two-year period of time, living a lavish lifestyle that included first class air travel, trips to spas, extravagant gifts, jewelry, mink coats and illegal drugs. Mr. Sheriff, by his own estimate, spent nearly $100,000 on cocaine. The appellants did not cease their illegal activity until Ms. Trotter was confronted by the Rozens in November of 2002. The record also reflects that Ms. Trotter had no criminal history. Mr. Sheriff's criminal history included several traffic offenses which were nollied. Mr. Sheriff claimed that he had two arrests for DUI in Bristol, Virginia, but an NCIC report was requested by the person preparing the presentence report and no response was received.

After listening to the evidence at the hearing on alternative sentencing, the trial court determined:

> It appears that the Rozens suffered a devastating loss by Ms. Trotter's employment there. She took advantage of the fact that she could steal money and cover it up because no one was checking right behind her. Now I don't excuse Mr. Sheriff either. Because I don't find that he didn't know all that was going on. In fact, I am not so sure that he didn't, didn't help her make up her mind to start stealing. He had a problem. He needed money bad. Mr. Sheriff needed money bad. And credit cards at its limit and of all that. So I don't deny that he . . . was in on this too. In fact, I kind of feel that he was in on it too, knowing that she was in a position that she could get it and she got it. She took it on herself to start stealing. She didn't have to do it. But what they say, love make [sic] you do a lot of things. Love makes you do a lot of things. There's an old saying, I love you. I love you. Bang. Bang. you shoot the person because you love them so much, you can't see them go somewhere else. People jump off the bridge for love.
>
> But in this case the Rozens suffered tremendously because of whatever it was love or greed. I think it was both. A lot of both, love and greed that caused this to happen. Nearly five hundred thousand dollars taken in, what, two, a couple of years from the employer and they bought all sorts of things. Things, luxury items, and I won't go into all the things that they may have bought . . . . But Ms. Sheriff, Mr. Sheriff, excuse me, and . . . Ms. Trotter spent a lot of this money on a lot of luxury

items and sent the business down a downward spiral to the brink of bankruptcy, and see.

And I considered the fact, you have to consider the fact that Ms. Trotter doesn't have a prior record of anything. The law says I got [sic] to look at that. The fact that she doesn't have any convictions of criminal offenses in the past throughout her - - though she's pretty young - - in her history. Apparently a good student. Very good mind on her. But she used that mind to steal also.

Mr. Sheriff has no prior record to amount to anything. Although he was committing crimes all the time but he didn't get caught apparently. Because he said he's been on drugs, so that's a felony offense. He's buying drugs and using them, that's committing a crime even though he didn't get caught. So, but he doesn't have any convictions of it that I know about. He was able, I guess, to keep from being convicted of violating the law, possession, use of drugs. But he has no previous record. I have to look at that in terms of convictions, . . . .

And the Court has to consider his health. There is no problem with either of them [sic] mental health. Apparently they got [sic] good mental health that I know about. I haven't heard anything that would indicate any deficiencies in that regard.

The Court has to determine whether there's a need, a compelling need to protect society by restraining the defendants' conduct.

This type of activity of course is damaging to society. We heard about employees effected [sic], other things effected [sic], the Rozens effected [sic] in their relationship with other folk or businesses that they had to deal with, effected [sic] other folk or people. So that is detrimental to these defendants.

The Court has to decide whether granting any relief in this matter would depreciate the seriousness of this offense. And this was a serious offense, as you know.

The Court also must determine whether confinement would be particularly suitable for these defendants to provide an effective deterrence to others who might commit a similar offense. You have a lot of people that are working for other folk with the trust to handle money and all of that and deal with financial transactions that are fraught with many dollars. And the Court have [sic] to look at the fact that granting relief in this matter other folks that maybe stealing now but hadn't been caught see the newspaper it says, Judge [   ]granted relief in a matter where five hundred thousand dollars was fraudulently taken from the . . . Rozen[s]. And they say, well, I was stealing a thousand dollars a week but I might increase that value because if I get caught, Judge [   ] is going to put me on probation. That causes them

to feel that, well, I'm stealing now, but if I get caught, I was thinking about I'd better stop, but the courts will let you out, give you another chance, then I can go on. So the deterrent effect is very important in a case like this. The people that might do something like this should know that the hammer falls and it falls heavy in the event that you go to this extent and devastate a company.

So these are important consideration[s] [on] the other side of the scale, other side. On the one side you got [sic] no prior record of any [convictions], and this side you got these things. And the Court feels that the seriousness of this offense and the deterrent effect outweigh the fact that these persons have no prior record. Because of the amount, the way it was done. It apparently was not done just to get enough to survive, it was done to live close to what Donald Trump would want to live. So it goes beyond mere necessities of life. And . . . Mr. Sheriff is [not] that much less culpable. Because I believe she was stealing it, of course, she's the one primarily taking it, but I think Mr. Sheriff was right by her side in terms of her getting this, getting the benefits. He may have prompted her to do it. I don't know. Because of his necessities and that. . . .I've sat up here a long time and I've seen things and I get my feelings about testimony and what may have happened. I don't know whether she is evil or not. I wouldn't say she is evil. But I think she is a thief. And turn[ed] out to be a thief unfortunately. And ruined her life to this extent but she can recover. Both of them can recover if they - - after having put this behind them, they can come out and deliver a better life and turn themselves around.

But the Court's [sic] of the opinion at this time that it can't grant the petition as to either defendant because of the statements that I have given as to the reason why the Court can't grant relief at this time, and have to deny your petition as to all relief, alternatively or probation.

As stated previously, we review sentencing issues with the presumption that the determinations made by the trial court are correct so long as the trial court followed sentencing procedures. Tenn. Code Ann. § 40-35-401(d). The trial court herein primarily denied alternative sentencing based on the nature and circumstances of the criminal conduct and the need to provide an effective deterrent to others likely to commit similar crimes. These factors are both appropriate considerations for providing a proper basis for the denial of alternative sentencing. See Tenn. Code Ann. § 40-35-210(b)(4) & -103(1)(B); State v. Hooper, 29 S.W.3d 1 (Tenn. 2000).

In our estimation however, the trial court's unsubstantiated references to deterrence does not satisfy the dictates of State v. Hooper, 29 S.W.3d 1 (Tenn. 2000), "that the record must contain some proof of the need for deterrence before a defendant, who is otherwise eligible for probation or other alternative sentence, may be incarcerated." Id. at 9. Accordingly, we must review this matter de novo without a presumption of correctness.

With regard to a sentence of confinement based upon the need for deterrence, our supreme court has held that:

> The trial courts should be given considerable latitude in determining whether a need for deterrence exists and whether incarceration appropriately addresses that need. Accordingly, we will presume that a trial court's decision to incarcerate a defendant based on a need for deterrence is correct so long as any reasonable person looking at the entire record could conclude that (1) a need to deter similar crimes is present in the particular community, jurisdiction, or in the state as a whole, and (2) incarceration of the defendant may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes.

Hooper, 29 S.W.3d at 10. In this respect, the court suggested five non-exclusive factors that reveal "whether a need for deterrence is present and whether incarceration is 'particularly suited' to achieve that goal." Id. at 10. The following non-exclusive list of factors should be considered: (1) whether other incidents of the charged offense are increasingly present in the community, jurisdiction, or state as a whole; (2) whether the crime was the result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire to profit or gain from criminal behavior; (3) whether the alleged offense received substantial publicity beyond that normally expected in a typical case; (4) whether the defendant was a member of a criminal enterprise or substantially encouraged or assisted others in achieving the criminal objective; and (5) whether the defendant has previously engaged in criminal conduct of the same type as the offense in question, irrespective of whether such conduct resulted in previous arrests or convictions. Id. at 10-12. The court noted that these factors were meant as a guide and need not all be present before incarceration is deemed appropriate. Id. at 12. Further, the court stated that "[b]ecause the 'science' of deterrence is imprecise at best, the trial courts should be given considerable latitude in determining whether a need for deterrence exists and whether incarceration appropriately addresses that need." Id. at 10.

Further, although a judge may judicially notice some facts establishing a need for deterrence, the trial court's extrajudicial observations are not the proper basis for sentencing. Id. at 13; see Tenn. Code Ann. § 40-35-210(g) and Sentencing Commission Comments. "A judicially noticed fact must be one not subject to reasonable dispute, in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Tenn. R. Evid. 201(b). On the other hand, "a court may not consider facts outside the record that are within the judge's personal knowledge under the guise of taking judicial notice." State v. Nunley, 22 S.W.3d 282, 288 (Tenn. Crim. App. 1999).

In our de novo review herein, we observe that the only factor from Hooper which clearly supports a need for deterrence is factor two, that the appellants' crime was motivated by a desire to profit or gain from the criminal behavior. We acknowledge there is some evidence that the appellants were members of a criminal enterprise, albeit a small one, as Ms. Trotter stole the money after being encouraged by Mr. Sheriff to do so and both individuals reaped the benefits of the crime. However, it is not clear from the record whether other incidents of embezzlement are increasingly

present in the community, jurisdiction, or state as a whole or whether the case garnered substantial publicity. Finally, it is clear from the record that neither appellant had previously engaged in this type of criminal activity. Thus, at most, two of the factors from Hooper are present, one of them nominal at best. While we acknowledge that the Hooper factors are not all required to be present prior to a denial of alternative sentencing based on deterrence, Hooper, 29 S.W.3d at 12, we conclude from the record in this case that clear proof of one factor alone is insufficient to support the need for deterrence and the particular suitability of full incarceration in achieving that goal.

Thus, after review, we conclude that a sentence of split confinement will best serve the interests of the public and the appellants. Accordingly, the judgment is reversed and remanded for entry of a sentence of split confinement, pursuant to Tennessee Code Annotated section 40-35-306, reflecting a period of twelve months of confinement in the Shelby County Correction Facility with the remainder of the eight-year sentence to be served on supervised probation in a manner to be determined by the trial court.

### Conclusion

For the foregoing reasons, the judgment of the trial court is reversed and remanded for entry of a judgment of split confinement for each appellant to include a sentence of twelve months spent in confinement in the Shelby County Correctional Facility and the remainder of the sentence to be served on supervised probation. On remand, the trial court should determine the appropriate conditions for the probationary period.

_____
JERRY L. SMITH, JUDGE